## WITWER v. HAROLD LLOYD CORPORATION et al.

District Court, S. D. California, Central Division.

Nov. 18, 1930.

Harold A. Fendler and Ingle Carpenter, both of Los Angeles, Cal., for plaintiff.

R. C. Gortner and Lawler & Degnan, all of Los Angeles, Cal., and Walter N. Seligsburg, of New York City (Max Felix, of Los Angeles, Cal., of counsel), for defendants.

COSGRAVE, District Judge.

This action was brought by H. C. Witwer against Harold Lloyd Corporation, Pathe Exchange, Inc., Harold Lloyd, individually, and other employees of the Harold Lloyd Corporation. The bill charges infringement of the copyrighted story "The Emancipation of Rodney," written by Mr. Witwer, and published in the Popular Magazine on November 20, 1915. The infringing acts charged are the production and exhibition of the photoplay "The Freshman" and the publication of the novel in book form with the same title. Since the commencement of the action H. C. Witwer died, and Sadie S. Witwer, as administratrix of his estate, has been substituted as plaintiff. It is admitted that defendants Lloyd Corporation and Pathe Exchange, Inc., produced the photoplay and intended to continue so doing, and that the defendant Lloyd Corporation caused the novel to be published as a means of exploitation of the photoplay. That the copyright of a story can be so infringed has been determined. Kalem Co. v. Harper Bros., 222 U. S. 55, 32 S. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285.

The matters interposed in defense of the action are, first, the absence of the infringement; second, that the plaintiff is not the owner of the copyright, but a mere licensee, and therefore without capacity to maintain suit; third, estoppel against the plaintiff's intestate; fourth, no right in plaintiff to recover damages and profits.

The evidence shows that, after writing the story in 1915, the author sold it to Street & Smith, copartners, of New York, publishers of the Popular Magazine. The story was published in the magazine of November 20, 1915, and duly copyrighted by Street & Smith, who later in 1917 became incorporated as Street & Smith, Inc. In November, 1919, Street & Smith, Inc., through their manager, Charles A. McLean, agreed with Mr. Witwer that, if he would write a series of stories, he could have the motion picture rights and all other rights of a certain number of the series, which included "The Emancipation of Rodney." Mr. Witwer wrote the required number of stories, and they were published in the magazine, and the theory of the plaintiff is that from that time forward Street & Smith, Inc., held the copyright in question in trust for Mr. Witwer. On February 13, 1929, the Street & Smith Corporation, by instrument

in writing, assigned to H. C. Witwer the copyright, "together with all rights now existing or which may hereafter come into existence except the right of magazine publication." This assignment was duly recorded in the copyright office.

The first issue to be disposed of is that of infringement. The original story published in 1915 in the Popular Magazine was placed in evidence. The photoplay "The Freshman" was reproduced in the courtroom. From a comparison of the two, I am convinced that plaintiff's charge of plagiarism is well founded. The features common to both are a country boy ambitious to be a popular athletic college hero. He is of nonathletic type. He practices college yells before a mirror in the privacy of his room. He has the college letter inscribed upon his sweater, and admires it in secrecy. He meets a girl to whom he tells exaggerated stories of his athletic prowess and who is sympathetic. He longs to be called by a familiar name. He studies the literature of athletics. In his actual athletic work he is pitifully weak. The coach in the one case and the upper class bully in the other are compared unfavorably with Simon Legree, the latter in one case being a "good samaritan" in comparison and in the other a "well mannered master." He inspires in the students feelings ranging from contempt to grudging toleration. He is generously allowed to think himself a member of the college athletic team when in reality he is not a part of it. He enjoys the bliss of this deception for a brief period. Finally realizing that he is an object of ridicule and contempt, he resolves to throw away pretense and be his real self. The photograph picturing himself as an athletic hero is discarded. He decides that his only hope for athletic eminence and consequent popularity is to take part in the football game with his college's traditional rival. The game is going badly against the home team. The team is reduced to the last available man. He grasps the coach in appeal and argument to be allowed to enter the play. He forces his way into the game. By an extremely unusual play he wins for the home team. The girl justifies her faith in him, in the one case telling his rival, "Didn't I tell you Rod would do it?" and in the other to him, "I knew you could do it." He is the hero of the hour, attains the coveted nickname, and naturally successful in his suit.

The foregoing is the substance or plot of the infringed and of the infringing production. One is the counterpart of the other. A comparison produces conviction that "The Freshman" is borrowed from "The Emancipation of Rodney" and the work of Witwer appropriated by the defendants. Naturally, there are features in one not reproduced in the other. The humor of Harold Lloyd does not appear in the magazine story, and much is added in "The Freshman" that furnishes a vehicle for this element. The photoplay is, however, "The Emancipation of Rodney," with variations that do not detract from its continuity and sequence. The similarity with the novel is not pronounced, and I am inclined to credit the testimony of the author of the latter that he had never seen "The Emancipation of Rodney" and dismiss it from this discussion.

The circumstances attending the making of the photoplay do not detract from this conclusion.

Mr. Lloyd himself, William R. Fraser, secretary and general manager of the defendant Lloyd Corporation, Sam Taylor, head of the scenario department, and John L. Murphy, production manager, all testified during the trial. It appears from their testimony without contradiction that in 1923, before "The Freshman" was photographed, one Bushey suggested to Mr. Fraser that defendant Lloyd should have Witwer, who was at that time a writer of wide repute, write a story, and Bushey arranged to bring Witwer to the Lloyd studio where he introduced him to Fraser. Fraser introduced Witwer to Lloyd, and to the latter Witwer related the magazine story he had written in 1915. The latter expressed a desire to read the story, and Witwer showed Lloyd the magazine containing it, and discussed the story with him, giving him the magazine itself. Lloyd did not know what became of the magazine, and it was never accounted for thereafter. Later, after the death of Witwer, at the request of the plaintiff in this action, search was made for the magazine, and the witness Fraser would not deny that search was made at the Lloyd studio, but the magazine was not returned.

Lloyd told Sam Taylor of his meeting with Witwer and of his idea for a college story. Lloyd sketched the story to Taylor, outlining a feature it contained, being a formula for winning the football game. Taylor rejected this feature as impossible. Lloyd suggested that Witwer come out to the studio and talk to Taylor and Fraser in further explanation of his story with a view to obtaining their approval of its adoption for their photoplay.

Taylor stated that he did not believe that Lloyd ever handed him the magazine, and later stated that he was sure that he had not. He did not remember discussing the purchase of Witwer's story with Lloyd and John L. Murphy. He admitted having signed a statement wherein he stated that Lloyd handed him the story in the Popular Magazine for reading, and that he discussed the purchase of the story with Lloyd and Murphy, but on the witness stand claimed that he was mistaken when he signed such a statement.

These facts, established by defendants' testimony, show contact, and are extremely suggestive that defendant at one time at least actually intended to use the Witwer story. In conjunction with the actual similarities between the two, they amply sustain piracy. Further facts are mentioned in the discussion of estoppel plea of defendants.

█ Under their plea of estoppel, defendants offered evidence that they outlined and explained their photoplay to Witwer before its production, and were assured by him that it in no way infringed his magazine story, "The Emancipation of Rodney," and that they were at liberty to produce their photoplay and use any episodes or features in his story that they wished. Witwer visited the Lloyd studio. According to Mr. Lloyd's testimony, this visit was at his own request and in order that Witwer might further explain the magazine story to Taylor. The latter, it will be remembered, would not consent to the adoption of the magazine story, deeming it unadaptable. Lloyd thought that, after a further explanation of the story by Witwer, Taylor might consent to its use. Murphy and Taylor, however, testify that the Witwer visit was in response to their invitation so that Witwer might be told their story to see how it compared with his "The Emancipation of Rodney."

All four, Lloyd, Taylor, Murphy, and Witwer, met together in Lloyd's dressing room in October, 1924. Witwer was in no condition to tell his story, and the meeting came to nothing. About a week later another meeting was had at which Lloyd was not present, where, according to the testimony of Taylor and Murphy, the photoplay "The Freshman" was described to Witwer, and he said it did not resemble "The Emancipation of Rodney," and they might produce their picture and use such features of his story as they wished. This was related to Lloyd by Murphy, and the picture was thereupon produced at an expense of several hundred thousand dollars. Taylor, however, stated that at the time of this last meeting he did not rely upon Witwer's statement, but believed then that Witwer intended suing for infringement.

In addition to the facts hereinbefore recited, the defendants show that they would not have expended the money or produced their picture but for the consent so given by Witwer. The evidence shows that defendants have been reimbursed this expenditure.

According to the testimony of defendants, "The Freshman" is their original production, made up entirely independent of the magazine story; that they had no preconceived plan in the beginning, but made it up as they went along. Nevertheless, they admit they feared a charge of plagiarism, and sought to avoid it in the manner described, that is, by submitting it to Witwer. This happened at a time before the picture was actually photographed. A verbal description of the photoplay is hardly equal to its actual production by the cinema, and it is not at all certain that the resemblance would be apparent from a mere description of the picture. It is important to note also that Mr. Lloyd himself testified that prior to the meeting, at which it is claimed Witwer made the statements attributed to him, decision had been reached to produce the picture. This reason alone would be sufficient to exclude the conclusion that the production of the picture was the result of the statement made by Witwer.

I do not find the evidence sufficient to convince me that Witwer, conceding that he made such statement, did so with full knowledge of the character of the defendants' production. Neither can I conclude that the consent so given was the determining factor in defendants' determination to produce the picture. 10 Cal. Juris. 627.

In this connection I am of the opinion that Lloyd personally had no knowledge of the actual plagiarism. He denies ever having read the magazine story. His actions indicate, as he testifies, an absence of knowledge of what the magazine story actually contained. Following a highly specialized line which gave life to the photoplay, he could not, in the natural course of events, have been as familiar with the facts as were his subordinates.

█ Defendants earnestly contend that, because the instrument, under which plaintiff claims title to the copyright, reserves the right of magazine publication to Street and Smith, it is not sufficient to entitle plaintiff to maintain the action; that it does not purport to convey all of the component parts of

the copyright; that any instrument conveying less than the sum of all the rights comprehended in the copyright does not constitute the assignee a copyright proprietor. They cite 13 Corpus Juris, 1094: "It seems that a copyright is an indivisible thing and cannot be split up and partially assigned, either as to time, place, or particular rights or privileges, less than the sum of all the rights comprehended in the copyright," and Weil on Copyrights, 545, to the same effect. The language is used in considering the effect of doubtful instruments where the effect of assignments is claimed for mere licenses. It does not prevent assignment with a reservation of particular rights.

The two authorities cited both modify the position above taken, however. Weil himself says, paragraph 547, that the dicta referred to did not contemplate a situation where the copyright represents an aggregate rather than a single right. He further uses the following language (page 556, par. 1570): "After assignment, an author has of course, no more right to use the copyright work than a stranger has, unless he has reserved such right in making his assignment."

Corpus Juris is to the same effect: "Where the property assigned is described as the 'copyright,' all rights of every description secured to the assignor by virtue of his copyright pass to the assignee, except such, if any, as are reserved to the assignor by the terms of the contract." 13 C. J. 1099, par. 252.

I am unable to agree with the position taken by the defendants. To do so would be to deny to this instrument the interpretation given to conveyances generally. The language is entirely plain, and is effective to convey the interest in the copyright if the intention of the parties is to be regarded. The statute expressly gives freedom of contract to this form of property. It may be assigned, granted, or mortgaged. 17 USCA § 42. Had Street & Smith, Inc., conveyed without the reservation, and then had Witwer assigned to it the right of magazine publication, we would have a situation exactly as the parties intended by this instrument, and entirely free of the objection urged by defendants. Why, then, should a similar situation not arise when the result is accomplished by the execution of one instrument instead of two? Suppose Street & Smith had assigned the right of magazine publication to some third party and then executed the instrument omitting the reservation, but with knowledge on the part of Witwer of the prior license, the assignment would then possess in fact the same asserted vice that it does now, but it would hardly be argued that Witwer in such a case would not have the right to maintain the suit for infringement of an element of his copyright in no way relating to magazine publication.

While the circumstance is not controlling, it may be noted that the instrument apparently is deemed sufficient as an assignment by the copyright office, as it was regularly registered therein as an assignment.

Defendants contend that no right exists in plaintiff to recover damages suffered prior to the assignment. Plaintiff does not contend that the mere assignment of the copyright carries with it the right to damages for past infringement, but claims that, since plaintiff and her predecessor in interest have been the equitable owners of the copyright since 1919, when the transactions took place by which Street & Smith, Inc., agreed that H. C. Witwer should own the copyright, he then became the equitable owner, and as equitable owner the suit may be maintained for past infringement.

While the authorities are clear that the equitable owner may maintain a suit when the holder of the legal title is a defendant, I have found no cases directly supporting the position that suit may be brought by the equitable owner against one other than the holder of the legal title without joining the latter. No defense of nonjoinder, however, is pleaded by defendants. The character of H. C. Witwer as owner of the equitable title to the copyright is not disputed so far as the evidence in the case shows, and I am inclined to sustain the position taken by plaintiff in this respect. In a suit by the owner of only an equitable title, the owner of the legal title should perhaps be joined as a party, but this does not seem to be held absolutely necessary. Street & Smith, Inc., appear to be only a nominal party, and the plaintiff is the real party in interest, and should be deemed able to recover such damages. 21 C. J. 304; 25 Cal. Jur. 354.

This will carry reasonable attorney's fees.

Plaintiff is directed to present findings and decree in accordance with this opinion.